# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

_____

| | |
|---|---|
| **ROBIN GREEN** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )  **Civil Action No. WGC-09-2897** |
| | ) |
| **MICHAEL ASTRUE** | ) |
| **Commissioner of Social Security** | ) |
| | ) |
| **Defendant.** | ) |

_____)

## MEMORANDUM OPINION

Plaintiff Robin Green ("Ms. Green" or "Plaintiff") brought this action pursuant to 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Act, 42 U.S.C. §§ 401-433, 1381-1383f.  The parties consented to a referral to a United States Magistrate Judge for all proceedings and final disposition.  *See* Document Nos. 5, 7-8.[1]  Pending and ready for resolution are Plaintiff's Motion for Summary Judgment (Document No. 12) and Defendant's Motion for Summary Judgment (Document No. 27).  No hearing is deemed necessary.  *See* Local Rule 105.6 (D. Md. 2010).  For the reasons set forth below, Defendant's Motion for Summary Judgment will be granted and Plaintiff's Motion for Summary Judgment will be denied.

---

[1]  The case was subsequently reassigned to the undersigned.

1. **Background**.

On April 1, 2005 Ms. Green protectively filed applications for DIB[2] and SSI alleging a disability onset date of February 19, 2005 due to lupus[3], asthma and problems with walking. *See* R. at 34, 41-46. Ms. Green's applications were denied initially on May 24, 2005. R. at 34-38. On July 22, 2005 Ms. Green requested reconsideration, R. at 33, and on March 31, 2006 the applications were denied again. R. at 31-32. On April 12, 2006 the Social Security Administration received Ms. Green's request for a hearing before an Administrative Law Judge ("ALJ"). R. at 25. On July 19, 2007 the ALJ convened a hearing. R. at 273-98. Ms. Green was represented by counsel at this hearing. The ALJ obtained testimony from Ms. Green and a vocational expert ("VE"). In the September 27, 2007 decision the ALJ found Ms. Green is not disabled within the meaning of the Act. R. at 20. Ms. Green requested a review of the hearing decision. R. at 9, 272. On October 2, 2009 the Appeals Council denied Ms. Green's request for review, R. at 5-7, thus making the ALJ's determination the Commissioner's final decision.

2. **ALJ'S Decision**.

The ALJ evaluated Ms. Green's claims for DIB and SSI using the sequential evaluation process set forth in 20 C.F.R. §§ 404.1520, 416.920. Ms. Green bears the burden of demonstrating her disability as to the first four steps. At step five the burden shifts to the

---

[2] Ms. Green has acquired sufficient quarters of coverage to remain insured through June 30, 2010. R. at 15, 39. Under the "Issues" section of the decision the ALJ mistakenly wrote, "[t]he claimant's earnings record shows that the claimant has acquired sufficient quarters of coverage to remain insured through June 30, 2006." R. at 13.

[3] Lupus is the "name originally given to localized destruction or degeneration of the skin caused by various cutaneous diseases. Although the term was formerly used to designate lupus vulgaris and now lupus erythematosus, without a modifier it has no specific meaning." Lupus erythematosus is "a group of connective tissue disorders primarily affecting women aged 20 to 40 years, comprising a spectrum of clinical forms in which cutaneous disease may occur with or without systemic involvement." *Dorland's Illustrated Medical Dictionary* 958 (27th ed. 1988). Cutaneous pertains "to the skin, dermal; dermic." *Id.* at 414.

Commissioner.  If Ms. Green's claims fail at any step of the process, the ALJ does not advance to the subsequent steps.  *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995).  At step one the ALJ found Ms. Green has not engaged in substantial gainful activity since February 19, 2005, the alleged onset date of disability.  R. at 15.  The ALJ concluded at step two that Ms. Green's fibromyalgia and degenerative disc disease of the right knee are severe impairments.  *Id.*  At the hearing Ms. Green testified about problems with anxiety.  The ALJ reviewed the medical records for any evidence of this condition.  He determined Ms. Green has no limitations (a) in activities of daily living, (b) in social functioning and (c) with regard to concentration, persistence or pace.  The ALJ further found Ms. Green has not experienced any episodes of decompensation.

The ALJ considered the various functions listed in paragraphs B and C of the adult mental disorders for Listing 12.00 of the Listing of Impairments.

> Because the claimant's mental impairment does not cause at least two "marked" limitations or one "marked" limitation and "repeated episodes of decompensation, the "paragraph B" criteria are not satisfied.
>
> The undersigned has also considered whether the "paragraph C" criteria are satisfied.  In this case, the evidence fails to establish the presence of the "paragraph C" criteria.

R. at 16.  The ALJ found Ms. Green does not have a severe mental impairment.  *Id.*

At step three the ALJ determined Ms. Green does not have an impairment or combination of impairments that meets or medically equals the criteria of any of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1.  The ALJ noted that "[f]ibromylagia is not a listed impairment but is considered a medically determinable

impairment under the Social Security Act and regulations." R. at 16. The ALJ considered Listing 1.00 (musculoskeletal system) and Listing 14.00 (autoimmune system) and found Ms. Green has failed to show her impairment medically equals any of the impairments under Listings 1.00 and 14.00. With regard to Ms. Green's degenerative joint disease of the right knee, in light of Listing 1.02 (major dysfunction of a joint(s) (due to any cause)), the ALJ determined Ms. Green's impairment has not resulted in severe ambulatory dysfunction pursuant to section 1.00B2b. *Id.*

Next the ALJ determined Ms. Green's residual functional capacity ("RFC"). The ALJ found Ms. Green can "perform a range of light work that involves routine and simple job tasks." *Id.* At step four the ALJ found Ms. Green is unable to perform any past relevant work. R. at 19. Finally, at step five, the ALJ considered Ms. Green's age (42 at the hearing; a younger individual), education (high school graduate and able to communicate in English), past work experience (transferability of job skills is not material) and her RFC (simple, routine light work). The ALJ found the Social Security Administration met its burden of proving that Ms. Green is capable of performing various other jobs[4] that exist in significant numbers in the national economy, relying on the testimony of the VE. R. at 20, 294. Accordingly, the ALJ concluded that Ms. Green is not disabled within the meaning of the Act. R. at 20.

3. **Standard of Review**.

The role of this Court on review is to determine whether substantial evidence supports the Commissioner's decision and whether the Commissioner applied the correct legal standards. 42 U.S.C. § 405(g); *Pass v. Chater*, 65 F.3d at 1202; *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind

---

[4] A cashier and a security guard.

might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). It is more than a scintilla, but less than a preponderance, of the evidence presented, *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (citations omitted), and it must be sufficient to justify a refusal to direct a verdict if the case were before a jury. *Hays*, 907 F.2d at 1456. This Court cannot try the case *de novo* or resolve evidentiary conflicts, but rather must affirm a decision supported by substantial evidence. *Id*.

4. **Discussion**.

A. *Weight Accorded to the Opinion of State Agency Medical Consultant; Medical Equivalence*

In the decision the ALJ wrote, "[t]he medical assessment of the State Agency dated May 20, 2005, which is compatible with light work, is supported and consistent with the medical evidence and is afforded substantial weight, pursuant to SSR 96-6p." R. at 19. Plaintiff contends the ALJ committed reversible error since this May 20, 2005 opinion *predates* the vast majority of Ms. Green's medical records. Under such a circumstance Plaintiff argues the ALJ should have "sought an updated opinion from a State Agency medical consultant or, alternatively, recontacted Ms. Green's treating sources for clarification of their assessments, or directed that Ms. Green undergo a consultative examination at Defendant's expense." Mem. Supp. Pl.'s Mot. Summ. J. ("Pl.'s Mem.") at 20. Moreover Plaintiff argues the ALJ's failure to obtain an updated medical opinion *after* all of Ms. Green's medical records were received left unresolved the issue of medical equivalency.

In his motion for summary judgment the Commissioner notes Ms. Green bears the burden of establishing her impairment is medically equivalent to a listing. In response to

Plaintiff's assertion that the ALJ committed a reversible error, the Commissioner makes the following observations.

> Although the administrative transcript contains evidence post-dating both opinions,[5] Green does not cite any medical evidence that is significantly different than the evidence considered by Dr. Caviness and Dr. Moore (Pl. Br. 19-22). In fact, Green cites no medical evidence whatsoever (Pl. Br. 19-22). Moreover, Green does not even cite any Listing that her impairments allegedly equaled (Pl. Br. 19-22). The Supreme Court stated that a claimant cannot prove that her impairments medically equaled a Listing when the claimant does not show medical evidence equal to the severity of the most closely-related Listing. [Sullivan v. ]Zebley, 493 U.S. [521,] 531 [(1990)]. As a result, Green cannot show any reversible error with the ALJ's step three determination.

Mem. Law Supp. Def.'s Summ. J. at 12.

Plaintiff asserts the medical records demonstrate she suffered from *Fibromyalgia*. The ALJ acknowledged this fact by finding fibromyalgia as a severe impairment at step two. At step three however the ALJ determined this severe impairment did not meet or medically equal a Listing. In the decision the ALJ wrote, "[f]ibromylagia is not a listed impairment but is considered a medically determinable impairment under the Social Security Act and regulations. The condition was not shown to medically equal any of the impairments described under 1.00 (musculoskeletal disorders) or 14.00 (autoimmune disorders)." R. at 16. As the Commissioner correctly notes, Plaintiff does not identify any Listing which is medically equivalent to her impairment. Moreover, Plaintiff does not identify any medical records supporting her claim of medical equivalency.

---

[5] State Agency Medical Consultant (Perry Caviness, M.D.) Opinion of May 20, 2005, R. at 82-90, and State Agency Medical Consultant (Philip H. Moore, M.D.) Opinion of March 24, 2006, R. at 133.

As for Plaintiff's assertion that the ALJ should have sought an updated medical opinion, re-contacted Ms. Green's treating physician or direct Ms. Green undergo a consultation examination because the state agency medical consultants' opinions *predate* the majority of her medical records on file with the Social Security Administration, Ms. Green protectively filed her claims for DIB and SSI on April 1, 2005 alleging a disability onset date of February 19, 2005. As the individual seeking benefits, Ms. Green "must provide medical evidence showing that [she has] an impairment(s) and how severe it is during the time [she] say[s] that [she is] disabled." 20 C.F.R. §§ 404.1512(c), 416.912(c) (2007). When Ms. Green's DIB and SSI claims were initially considered, the only medical evidence presented to the Social Security Administration was a University of North Carolina Hospitals report received on May 12, 2005. *See* R. at 34, 96-119.[6] Ms. Green was examined by Dr. Eric Olson on March 16, 2005 (the medical record was dictated on April 20, 2005). In a preliminary report Dr. Olson wrote, "she continues to have diffuse joint pains in ankles bilaterally, feet bilaterally, left wrist, right shoulder and a couple MCP[7] joints in her hands bilaterally. She continues to have lower extremity edema and feels that she is still having an accelerated hair loss although it is not any patchy hair loss, this is a diffuse thinning." R. at 100. Dr. Olson assessed Ms. Green's condition. "I suspect the patient has some type of immunologic process whether this be lupus or

---

[6] This record has the date "5/11/2005" listed on the bottom of each page.

[7] Metacarpophalangeal means "pertaining to the metacarpus ["the part of the hand between the wrist and the fingers, its skeleton being five cylindric bones (metacarpals) extending from the carpus to the phalanges"] and phalanges ["plural of phalanx"; *phalanx* means "any of the bones of the fingers or toes"]. *Dorland's Illustrated Medical Dictionary* 1014, 1270.

Sjogren's[8] or scleroderma[9] uncertain. I have sent off more immunologic workup today for further evaluation. . . . Pending the results of her immunologic workup, I may need to refer her to Rheumatology as well." *Id.*

The records received on May 12, 2005 also included an examination and testing concerning Ms. Green's asthma. The radiology result showed an "unremarkable chest." R. at 113.

Dr. Perry Caviness, a state agency medical consultant, reviewed Ms. Green's medical records. On May 20, 2005 he completed Form SSA-4734-BK, *Physical Residual Functional Capacity Assessment*. Based on Ms. Green's medical records Dr. Caviness identified Ms. Green's primary diagnosis as multiple arthralgias,[10] her secondary diagnosis as asthma and her other alleged impairments as lupus. *See* R. at 82. Based on the records review Dr. Caviness identified Ms. Green's exertional limitations as follows: occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, can stand and/or walk for a total of about 6 hours in an 8-hour workday, can sit for a total of about 6 hours in an 8-hour workday and is unlimited with regard to pushing and/or pulling. R. at 83. As for postural limitations, Dr. Caviness opined Plaintiff should never climb ramps, stairs, ladders, ropes or scaffolds. Ms. Green can occasionally balance. The remaining postural limitations — stooping, kneeling,

---

[8] Sjögren's syndrome is "a symptom complex of unknown etiology, usually occurring in middle-aged or older women, marked by the triad of keratoconjunctivitis sicca with or without lacrimal gland-enlargement, xerostomia with or without salivary gland enlargement, and the presence of a connective tissue disease, usually rheumatoid arthritis but sometimes systemic lupus erythematosus, scleroderma, or polymyositis. An abnormal immune response has been implicated." *Id.* at 1644.

[9] Scleroderma is a "chronic hardening and thickening of the skin, which may be a finding in several different diseases, occurring in a localized or focal form and as a systemic disease." *Id.* at 1495.

[10] Arthralgia means "pain in a joint." *Id.* at 147.

crouching and crawling – Dr. Caviness opined Ms. Green can do frequently. R. at 84. The only other limitation noted by Dr. Caviness was Environmental Limitations. He opined Ms. Green should avoid concentrated exposure to fumes, odors, dusts, gases and poor ventilation. Ms. Green should also avoid concentrated exposure to hazards, specifically, machinery, heights, etc. R. at 86.

When a second state agency medical consultant reviewed Ms. Green's medical records at the reconsideration level, the Social Security Administration received additional medical records, namely (a) University of North Carolina Hospitals received on January 30, 2006, R. at 91-95,[11] (b) records from Dr. Nasser Nasseri-Asl received on March 3, 2006, R. at 124-31, (c) one page certification from St. Agnes HealthCare stating it has no records of Ms. Green from September 2005 to present, R. at 132, (d) that no report has been received from Dr. Charles Wu, *see* R. at 31, and (e) two records from Ms. Green received on January 30, 2006, specifically, Form DDS-34PQ, *Personal Pain Questionnaire*, R. at 63-64, and Form SSA-3373-BK, *Function Report – Adult*, R. at 65-74.

The additional medical records listed above are summarized as follows. On May 25, 2005 Ms. Green had a follow-up visit at the University of North Carolina Hospitals for shortness of breath. Dr. Olson described the history of Ms. Green's present illness stating in pertinent part,

> [L]aboratory analysis revealed a positive ANA.[12] ENA[13] panel was
> negative. She has been seen by Rheumatology, who felt her

---

[11] This record has the date "1/23/2006" listed on the bottom of each page. *See* R. at 92-95.

[12] "ANA is an acronym for Anti-Nuclear Antibody. The ANA blood test is a nonspecific screen for autoimmune stimulation. Its use in Rheumatology is to screen for Connective Tissue Disease; however, the presence of an ANA is not isolated to rheumatic diseases." *Net Wellness: Consumer Health Information*, ANA vs. ENA Test, http://www.netwellness.org/healthtopics/arthritis/anatest.cfm (last visited April 12, 2011).

> musculoskeletal complaints are more consistent with fibromyalgia and not an active autoimmune process. . . She continues to complain of multiple symptoms including multiple gastrointestinal symptoms including indigestion, diarrhea, constipation, nausea and vomiting as well as intermittent coughing and shortness of breath as well as diffuse muscle aches and joint pains especially in her ankles bilaterally.

R. at 92.  Under assessment and plan Dr. Olson noted Ms. Green was moving back to Baltimore. Dr. Olson opined Ms. Green would be better served by establishing a relationship with a general internal medicine primary care physician "as I do not believe that she has any primary pulmonary problems."  R. at 93.

Upon her return to Baltimore Ms. Green established a relationship with Dr. Charles Wu, an Internal Medicine Specialist, who referred Ms. Green to Dr. Nasser Nasseri-Asl in the Rheumatology Clinic of Harbor Hospital, Arthritis & Osteoporosis Center in Baltimore, Maryland.  Dr. Nasseri-Asl saw Ms. Green on October 10, 2005.  He physically examined Ms. Green and noted in pertinent part,

> Her musculoskeletal examination revealed cool joints.  Ther[e] was no evidence of acute or chronic synovitis.[14]  The range of motion in her cervical spine, shoulders, elbows, wrists, hips, knees, and ankles was within normal limits.  She has diffuse tender points, which were characteristics of fibromyalgia tender points.  Her muscle strength was 5/5 for all muscle groups tested.

R. at 129.  Dr. Nasseri-Asl summarized his findings of Ms. Green's history and the physical examination, stating in pertinent part,

---

[13] "ENA is an acronym for Extractable Nuclear Antigens."  "ENA panel detects antibodies to specific antigens within the nucleus that might be responsible for the elevated ANA."  *Id.*

[14] Synovitis means "inflammation of a synovial membrane.  It is usually painful, particularly on motion, and is characterized by a fluctuating swelling due to effusion within a synovial sac."  *Dorland's Illustrated Medical Dictionary* 1649.

> Based on her history and physical examination, I do not see overwhelming evidence of systemic lupus erythematosus or mixed connective tissue disorder[15]. However, I have ordered extensive laboratory tests to rule that out.
>
> I believe that most likely she has secondary fibromyalgia syndrome.

R. at 129-30.

Ms. Green saw Dr. Nasseri-Asl for a follow-up appointment on December 19, 2005. He physically examined her and noted the following.

> Her musculoskeletal examination revealed diffuse tender points over her bilateral shoulders, elbows, wrists, hips, knees, and ankles. Her muscle strength was 5/5 for all muscle groups tested. There were no signs of active or chronic synovitis.

R. at 125. Dr. Nasseri-Asl concluded his report with an assessment stating in the first sentence, "At this time, based on the patient's history and physical examination, I believe that she has evidence of secondary fibromyalgia and this could be possibly secondary to her anemia and EBV[16] infection." R. at 126.

The remaining medical records considered at the reconsideration level are Ms. Green's self-reporting by answering a personal pain questionnaire and completing an adult function report. On March 24, 2006 Dr. Philip H. Moore completed Form SSA-416, *Case Analysis*. Dr. Moore affirmed the exertional limitations, namely, Ms. Green can lift 20 pounds occasionally,

---

[15] Mixed connective tissue disorder (MCTD) is an uncommon autoimmune disorder that causes overlapping features of primarily three connective tissue diseases — lupus, scleroderma and polymyosis. Mixed connective tissue disease also may have features of rheumatoid arthritis. For this reason, mixed connective tissue disease is sometimes referred to as an overlap disease." *Mayo Clinic*, http://www.mayoclinic.com/health/mixed-connectivie-tissue-disease/DS00675 (last visited April 13, 2011).

[16] Epstein-Barr virus. "[A] herpesvirus in the genus Lymphocrypotvirus that causes infectious mononucleosis and is also found in cell cultures of Burkitt lymphoma; associated with nasopharyngeal carcinoma." *mediLexicon*, http://www.medilexicon.com (last visited April 12, 2011).

lift 10 frequently and has a capability to stand and/or walk for about 6 hours in an 8 hour workday as well as sit for about 6 hours in an 8 hour workday.  R. at 133.

The medical evidence received *after* the reconsideration level consists of (a) records from Dr. Wu, R. at 134-41, 170-89, 201-04, (b) records from Dr. Mohammad Esfahani, R. at 190-200, 236-39, (c) Outpatient Clinic Record of Maryland General Hospital, Dr. Rolando Alegado attending physician, R. at 142-45, 216-25, (e) Physical Therapy records from Rehab Center at Maryland General Hospital, R. at 146-69, (f) results of MRIs, body scans and X-rays, R. at 205-15, 226-34, 235 and (g) records from Good Samaritan Hospital, R. at 240-71.

On August 16, 2005 Dr. Wu completed a Medical Report Form 402B for Anne Arundel Department of Social Services.  During this visit Ms. Green complained of muscle aches all over. R. at 138.  Dr. Wu's assessment was based on the August 16, 2005 visit.  He determined Ms. Green's muscle strength was 1-2 out of 5 for upper extremities and 1-2 out of 5 for lower extremities.  *Id.*  Dr. Wu opined Ms. Green can sit, stand, walk and reach for no more than 1 hour in an 8-hour workday; that she can never climb, carry, bend, squat or crawl; that the heaviest weight she can lift is less than 10 pounds and that she can lift/carry frequently 10 pounds.  R. at 139.  Dr. Wu further opined that Ms. Green has *marked* restriction of activities of daily living, *marked* difficulties in maintaining social functioning, *frequent* difficulties in maintaining concentration, persistence or pace and *repeated* episodes of decompensation, each of an extended duration.  R. at 140.  Additionally Dr. Wu opined Ms. Green's medical

condition would prevent her from working for a year.  *Id.*  Dr. Wu diagnosed the following

conditions:  polymyalgia[17], GERD, bronchospasm[18] and anemia.  R. at 138.

On May 23, 2006[19] Dr. Wu completed another Medical Report Form 402B, for the Anne

Arundel County Department of Social Services, based on his examination of Ms. Green who

complained about pain in her neck, shoulders, hands, wrists, knees, ankles and feet.  R. at 172.

Dr. Wu diagnosed fibromyalgia as one of her medical conditions and identified the onset date

as one year ago.  He determined her muscle strength was 2-3 out of 5 for upper extremities and

2-3 out of 5 for lower extremities.  *Id.*  Dr. Wu opined Ms. Green can sit, stand, walk and reach

for no more than 1 hour in an 8-hour workday; that she can never climb, carry, bend, squat or

crawl; that the heaviest weight she can lift is less than 10 pounds and that she can lift/carry

frequently 10 pounds.  R. at 173.  Dr. Wu further opined that Ms. Green has *marked* restrictions

of activities of daily living, *marked* difficulties in maintaining social functioning, *frequent*

difficulties in maintaining concentration, persistence or pace and *repeated* episodes of

decompensation, each of an extended duration.  R. at 174.  Additionally Dr. Wu opined Ms.

Green's medical condition would prevent her from working for a year.  *Id*

Also, on May 23, 2006, Dr. Wu completed two additional forms.  On the *Medical

Assessment of Ability to Do Work Related Activities (Physical)* Dr. Wu opined Ms. Green can sit

up to 60 minutes at a time, stand for 30 minutes at a time and walk 30 minutes without resting.

---

[17]  Polymyalgia means "myalgia ["pain in a muscle or muscles"] affecting several muscles."  *Dorland's Illustrated Medical Dictionary* 1083, 1332.

[18]  Bronchospasm means "spasmodic contraction of the smooth muscle of the bronchi, as occurs in asthma."  *Id.* at 238.

[19]  According to Dr. Wu, he first saw Ms. Green on August 16, 2005 and her last visit was December 22, 2005.  *See* R. at 172.

Ms. Green is restricted to lifting and carrying 10 pounds. R. at 134. One of the diagnoses supporting these restrictions is fibromyalgia. Dr. Wu opined the conditions and limitations have existed for one year. R. at 135. On the *Medical Assessment of Ability to Do Work Related Activities (Mental)* Dr. Wu opined, under the category, "Ability in Making Occupational Adjustments," that Ms. Green has a *poor* ability in dealing with the public, a *poor* ability in using judgment with the public and *no useful ability* to deal with work stresses. R. at 136. Under the category, "Ability in Making Performance Adjustments," Dr. Wu opined Ms. Green has a *poor* ability to maintain attention and concentration and a *poor* ability to understand, remember and carry out job detailed, but not complex instructions. R. at 137. Finally Dr. Wu opined Ms. Green does not have the capacity to endure the mental demands of competitive work on a sustained basis, meaning 8 hours per day, 5 days per week. *Id.*

On May 10, 2007 Dr. Wu completed a *Medical Assessment of Ability to do Work-related Activities (Mental)*. For the category, "Making Occupational Adjustments," Dr. Wu opined Ms. Green has a *fair* ability to (a) relate to co-workers, (b) function independently and (c) maintain attention, concentration but a *poor* ability to (a) deal with the public, (b) use judgment with the public and (c) deal with work stresses. R. at 201. For the category, "Making Performance Adjustments," Ms. Green has a *fair* ability to (a) understand, remember and carry out complex job instructions and (b) understand, remember and carry out detailed, but not complex, job instructions. R. at 202. Under the category, "Making Personal-Social Adjustments," Ms. Green has a *fair* ability to relate predictably in social situations. *Id.* Finally Dr. Wu opined Ms. Green has *moderate* restriction of activities of daily living, *moderate* difficulties in maintaining social

functioning, *moderate* deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner and *repeated* episodes of decompensation.  R. at 203.

Dr. Wu referred Ms. Green to Dr. Mohammad Esfahani for a Rheumatology consultation.  Dr. Esfahani saw Plaintiff on January 31, 2007, February 22, 2007, March 21, 2007 and April 18, 2007.  *See* R. at 236-39.  On April 23, 2007 Dr. Esfahani completed an *Arthritis Residual Functional Capacity Questionnaire* and a *Fibromyalgia Residual Functional Capacity Questionnaire*.  *See* R. at 190–200.  With regard to the latter questionnaire, Dr. Esfahani identified clinical findings showing Ms. Green's medical impairment, specifically, tender range of motion in shoulders, wrists and knees.  R. at 195.  Based on his examination Dr. Esfahani found Ms. Green's pain is located bilaterally in the shoulders, hands/fingers, legs and knees/ankles/feet.  R. at 196.  The pain is described as "dull, chronic, moderate."  *Id.*  Dr. Esfahani opined Ms. Green meets the American Rheumatological criteria for fibromyalgia.  R. at 195.  Based on Ms. Green's impairments Dr. Esfahani opined Ms. Green can sit continuously for 30 minutes, stand continuously for 20 minutes, walk 1-2 city blocks without rest, can sit a total of less than 2 hours and can stand a total of less than 2 hours in an 8 hour working day.  R. at 197-98.  Dr. Esfahani opined Ms. Green can lift and carry occasionally less than 10 pounds and can never lift and carry 10 pounds, 20 pounds or 50 pounds.  Dr. Esfahani determined Ms. Green has significant limitations in performing repetitive reaching, handling or fingering.  He opined during an 8 hour working day Ms. Green can grasp, turn and twist objects with her hands (right and left) only 5% of the time, that she can use her fingers (both right and left) for fine manipulations only 10% of the time, and reach with her arms (both right and left) including reaching overhead only 10% of the time.  R. at 199.

The ALJ found Dr. Wu's extreme physical limitations contradicted by the physical examinations conducted by Dr. Nasseri-Asl, a rheumatologist. In addition, the ALJ also found Dr. Esfahani's findings unsupported or inconsistent with his own treatment notes. The Court has reviewed Dr. Esfahani's treatment notes. None of Dr. Esfahani's handwritten notes indicate any limitations with respect to Ms. Green performing repetitive reaching, handling or fingering. During the physical examination on January 31, 2007 Dr. Esfahani found good range of motion in Ms. Green's shoulders, elbows, hands, knees and hips. R. at 239. At this first visit Dr. Esfahani wrote under "Problem List" palpitation and fibromyalgia. *Id.* During the physical examination on February 22, 2007 Dr. Esfahani noted "tender (B) MCPs." R. at 238. The abbreviation refers to the metacarpophalangeal being tender bilaterally. Under "Problem List" Dr. Esfahani noted flat feet, inflammation and arthritis. Moreover under "A/P" meaning Assessment/Plan, Dr. Esfahani wrote "fibromyalgia stable" but noted the positive ANA. *Id.* By March 21, 2007 Dr. Esfahani found Plaintiff's MCP's mild bilaterally. R. at 237. The medical conditions Dr. Esfahani identified on the "Problem List" were flat feet, inflammation, arthritis and positive ANA. During the final physical examination on April 18, 2007 Dr. Esfahani noted a tender range of motion, bilaterally, of the shoulders and wrists. R. at 236. The medical conditions Dr. Esfahani identified on the "Problem List" were hypertension, PUD[20] v. GERD[21], flat feet and positive ANA. *Id.* It is noteworthy that none of Dr. Esfahani's handwritten notes

---

[20]  Peptic Ulcer Disease (PUD) is a "stomach disorder marked by corrosion of the stomach lining due to the acid in the digestive juices." *The Free Dictionary*, http://medical-dictionary.thefreedictionary.com/PUD (last visited April 14, 2011).

[21]  Gastroesophageal Reflux Disease (GERD) is a "chronic condition in which the lower esophageal sphincter allows gastric acids to reflux into the esophagus, causing heartburn, acid indigestion, and possible injury to the esophageal lining." *The Free Dictionary*, http://medical-dictionary.thefreedictionary.com/GERD (last visited April 14, 2011).

address issues with regard to Ms. Green's ability to lift, the length of time she can stand nor the length of time she can sit. The ALJ's findings are supported by substantial evidence.

Although the medical records from Dr. Wu, the medical records of Dr. Esfahani and well as several other medical records were produced *after* the state agency medical consultants rendered their opinions, the ALJ was not required to request updated opinions from these state agency medical consultants.

> [A]n administrative law judge . . . **must obtain** an updated medical opinion from a medical expert . . . [w]hen additional medical evidence is received that in the opinion of the administrative law judge . . . **may change** the State agency medical . . . consultant's findings that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments.

*Social Security Ruling* 96-6p, 1996 WL 374180 at *3-4 (S.S.A.) (emphasis added).

The ALJ did not find that the *post*-reconsideration level medical evidence may change the state agency medical consultants' findings and thus the ALJ was not required to obtain an updated medical opinion. As Plaintiff even concedes, it is the ALJ's responsibility to decide whether a listing has been met or equaled. Substantial evidence supports the ALJ 's finding at step 3. No reversible error was committed by the ALJ.

Finally, the ALJ assigned substantial weight to the May 20, 2005 assessment by Dr. Caviness, which is compatible with light work, because the assessment is supported and consistent with the medical evidence pursuant to 96-6p. Per *Social Security Ruling* 96-6p an ALJ cannot ignore such an opinion and must explain the weight assigned. *SSR 96-6p*, 1996 WL 374180 at *1.

*B.*     *Evaluating Plaintiff's Fibromyalgia; Weight Assigned to Opinions of Treating Physicians*

In his decision the ALJ did not accord controlling weight to either the opinion of Dr. Wu

(an Internist) or to Dr. Esfahani (a Rheumatologist).  The ALJ's explanations follow.

> The claimant has been under treatment with family physician, Dr. Charles J. Wu since August 26[22], 2005.   Office records are somewhat illegible but show treatment for polymyalgia, GERD, bronchospasm and anemia.[23]
>
> \*                              \*                              \*
>
> As for her physical limitations, the examinations performed by rheumatologist, Dr. Nasseri-Asl were all unremarkable and disclosed no significant musculoskeletal condition which also contradicts the extreme physical limitations disclosed by Dr. Wu. Based on the foregoing, the undersigned has afforded no controlling weight to any of Dr. Wu's medical assessments, pursuant to SSR 96-2p.
>
> Dr. Mohammad Oneizi Esfahani examined the claimant on January 31, 2007, February 22, 2007 and April 18, 2007[24], for osteoarthritis of the left knee, hypertension and possible peptic ulcer disease.   He indicated in a residual functional capacity questionnaire that the claimant has nonrestorative sleep, morning stiffness, and dull, chronic pain affecting the shoulders, hands/fingers, legs and knees/ankles/feet.  He further disclosed that in an 8-hour work day, the claimant can only sit less than 2 hours and stand/walk less than 2 hours; lifting and carrying is limited to less than 10 pounds, occasionally (Exhibit 10F).  These findings are not supported by or consistent with Dr. Esfahani own treatment records which are minimal (Exhibit 16F), and is based primarily on the claimant's subjective allegations.  Based on the foregoing, the undersigned did not afford controlling weight to Dr. Esfahani's medical assessment.

R. at 18-19.

---

[22]  Should be August **16**, 2005.  *See* R. at 138-40, 185-86.

[23]  *See* R. at 138.

[24]  The ALJ failed to note the examination of March 21, 2007.  *See* R. at 237.

Despite the ALJ's determination that fibromyalgia is a severe impairment at step two, Plaintiff contends the ALJ's decision "belies the fact the he took her problem seriously." Pl.'s Mem. at 25. Plaintiff further insinuates the ALJ misunderstands fibromyalgia.

The issues are not the ALJ failing to take seriously Ms. Green's problem and misunderstanding fibromyalgia. The issues instead are the supportability and consistency of the treating sources' opinions.

Plaintiff correctly notes the ALJ's failure to mention the physical therapy records in his decision. *See* Pl.'s Mem. at 24. From November 20, 2006 to January 22, 2007 Ms. Green was enrolled in physical therapy. Ms. Green was referred to physical therapy because of HNP (herniated nucleus pulposus). R. at 167. This condition is, in essence, a herniated disk. She was also referred because of posterior tibial tendonitis. The referral to physical therapy was unrelated to Ms. Green's fibromyalgia and thus the ALJ properly omitted discussing these records.

Substantial evidence supports the ALJ's determination that Dr. Wu's opinion is not supported by Dr. Wu's notes or consistent with other evidence of record. Similarly Dr. Esfahani's opinion as documented on the *Fibromyalgia Residual Functional Capacity Questionnaire* is not supported by Dr. Esfahani's own treatment notes or is inconsistent with those treatment notes.

An ALJ does not automatically accord controlling weight to the opinions of treating sources merely because they are treating sources.

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique

perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling, we apply the factors listed in paragraphs (d)(2)(i)[25] and (d)(2)(ii)[26] of this section, as well as the factors in paragraphs (d)(3) through (d)(6)[27] of this section in determining the weight to give the opinion. We will always give good reasons in our . . . decision for the weight we give your treating source's opinion.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2007). The ALJ complied with the regulations in weighing the opinions of Drs. Wu and Esfahani.

Finally, the ALJ found Ms. Green's fibromyalgia a severe impairment. Fibromyalgia, in and of itself, is not a recognized listed impairment by the Social Security Administration. Fibromyalgia is similar to Chronic Fatigue Syndrome (CFS). In *Social Security Ruling 99-2p*, *Evaluating Cases Involving Chronic Fatigue Syndrome*, the Social Security Administration noted

There is considerable overlap of symptoms between CFS and Fibromyalgia Syndrome (FMS), but individuals with CFS who have tender points have a medically determinable impairment. Individuals with impairments that fulfill the American College of Rheumatology criteria for FMS (which includes a minimum number of tender points) may also fulfill the criteria for CFS.

*SSR 99-2p*, 1999 WL 271569 at *8 n.3 (Apr. 30, 1999).

This SSR further states, "[i]nasmuch as CFS is not a listed impairment, an individual with CFS alone cannot be found to have an impairment that meets the requirements of a listed

---

[25] Length of the treatment relationship and the frequency of examination.

[26] Nature and extent of the treatment relationship.

[27] Supportability, consistency, specialization and other factors.

impairment; however, the specific findings in each case should be compared to any pertinent listing to determine whether medical equivalence may exist." *Id.* at 4. Similarly, fibromyalgia is not an impairment that meets the requirements of a listed impairment but the ALJ compared the evidence in Ms. Green's case to pertinent listings, specifically 1.00 and 14.00, to determine whether medical equivalence existed. Ms. Green did not prove medical equivalence. The ALJ did not find any medical equivalence.

Because Ms. Green's fibromyalgia neither met a Listing nor was medically equivalent to a Listing, the ALJ then proceeded to determine her RFC. The ALJ found Ms. Green's functional capacities were not as restricted as Drs. Wu and Esfahani opined, and based on the record, determined she can still perform simple, routine light work. The Court finds no reversible error.

5. **Conclusion.**

Substantial evidence supports the decision that Ms. Green is not disabled. Accordingly, Plaintiff's Motion for Summary Judgment will be denied and Defendant's Motion for Summary Judgment will be granted.

Date:  April 21, 2011                                    _____/s/_____
                                                                    WILLIAM CONNELLY
                                                        UNITED STATES MAGISTRATE JUDGE